THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-20947-CR-LENARD

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| ADRIAN MARINO, | ) |
| HENRY TARRIO JR., and | ) |
| ROBERTO MARINO, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**THE UNITED STATES'S RESPONSE IN OPPOSITION TO
THE DEFENDANTS' OBJECTIONS TO THEIR RESPECTIVE PSIs**

The United States, by and through the undersigned Assistant United States Attorney, hereby files this Response to the Defendants' Objections to their respective Presentence Investigation Reports ("PSIs") (*See* Docket Entries ("D.E.s") 77, 78, and 86). In short, the United States argues that (1) as to the "loss calculation," the sixteen-level increase under U.S.S.G. Section 2B1.1(b)(1)(I) is appropriate because the actual loss incurred by the victim exceeded $1,000,000; (2) as to the "mass marketing" enhancement under U.S.S.G. Section 2B1.1(b)(2)(A), the two-level increase properly applies in this case to all defendants, as the conspiracy involved use of the Internet and online ads to solicit customers; and (3) there should be a two-level increase under U.S.S.G. Section 2B1.1(b)(4), as the defendants engaged in the business of receiving and selling the stolen property at issue, diabetic test strips.

**BACKGROUND**

- *Wholesale, Retail, and Black Market Values for the Diabetic Test Strips*

On June 24, 2011, a truck load of Abbott Laboratories diabetic testing supplies were stolen in Louisville, Kentucky. The truck load included 30,096 FreeStyle Lite Blood Glucose

Test Strips, among other products. The total value of the truck load to Abbott Laboratories was approximately $4,000,000. However, the product at issue in this case is limited to the FreeStyle **Lite** Blood Glucose Test Strips. According to Abbott Laboratories, the wholesale price for this product is approximately $56.99 per box, for a total of $1,715,342.01 (total wholesale value at issue). The retail price is approximately $63 per box, for a total of $1,896,048 (total retail value at issue). The defendants conspired to sell the stolen test strips at "black market" prices, ranging from $7 - $19 per box. On average, they sold the product for $10 per box, for a total of $300,960 (total black market price at issue).

As charged in the Indictment, and as the defendants pled guilty to, Count 2 charges that the defendants conspired to receive, possess, and sell the stolen Abbott Laboratories FreeStyle Lite Blood Glucose Test Strips between in or around June 2011 to on or about August 17, 2012. During that time, the total loss attributable to the defendants, by way of the dealings they did with undercover law enforcement agents or with victims of their fraudulent activities, was $89,100 (that is, the net gain by the defendants). There are, however, additional dealings that law enforcement are aware of (by way of the defendants' post-arrest admissions), but are unable to associate a known loss value to. Further, Defendant Henry TARRIO, Jr. proffered to law enforcment, on February 1, 2013, that the defendants had approximately 30,000 units of the diabetic test strips available to them for their resale.

- ***Issues to be Resolved***

The issue that is before the Court is whether the wholesale, retail, or black market value is the correct number to use to calculate the "loss" amount for purposes of U.S.S.G. Section 2B1.1(b)(1). The defendants argue that they should be held accountable for loss associated only with the known number of diabetic test strips they were caught with (that is, approximately 6,000

boxes). They seem to concede that the wholesale or retail value should be used in calculating the loss amount (that is, $56.99 or $63), versus the black market average price of $10/box. For the reasons set for below, the United States disagrees with the defendants. As stated in the PSIs, the correct "loss" amount to use in calculating the sentencing guidelines is the actual loss incurred by the victim in this case, Abbott Laboratories, as to the product at issue in this case, the FreeStyle Lite Blood Glucose Test Strips.

The Defendants also argue that the two (2) level increase for "mass marketing" under U.S.S.G. 2B1.1(b)(2)(A) is unwarranted. As also explained below, that argument is without merit. Further, an additional specific offense characteristic not listed in the PSIs applies in this case – because the defendants knowingly received stolen property, and were in the business of receiving and selling said stolen property, there should be a two-level enhancement under Section 2B1.1(b)(4).

## ARGUMENTS

I. **FOR PURPOSES OF U.S.S.G. § 2B1.1(b)(1), THE CORRECT VALUE TO USE IS THE ACTUAL LOSS THAT THE VICTIM, ABBOTT LABORATORIES, INCURRED DUE TO THE DEFENDANTS'S FRAUDULENT BEHAVIOR.**

Section 2B1.1 (formerly, Section 2F1.1) of the Sentencing Guidelines assigns a base offense level of six to a wide variety of fraud crimes. Because "fraud" comes in many forms, the list of specific offense characteristics is rather lengthy and detailed, in order to best calculate the proper enhancements to apply for the actions committed. Under Section 2B1.1(b)(1), there is an increase to the base offense level for the amount of "loss" that the defendants' actions resulted in. The "loss" specific offense characteristic is intended to measure the actual, attempted, or intended harm of the offense. *See United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996).

Generally speaking, "loss is the value of the money, property, or services unlawfully taken." *United States v. Munoz*, 430 F.3d 1357, 1370 (11th Cir. 2005). The Eleventh Circuit has stated that "loss is often not calculable 'with precision,'" and, thus, the "district court need only 'make a reasonable estimate of the loss, given the available information.'" *Id*. (internal citation omitted).

There are several means by which a district court may calculate loss under Section 2B1.1, as listed in commentary # 3 of the Sentencing Guidelines. As a general matter, "loss" is the greater of "actual loss" or "intended loss". Or, instead of using either "actual" or "intended" loss as a measure, the Court may use "gain" as a measure of loss – but only if the "actual" or "intended" loss amounts are indiscernible. The estimate of the loss should be based on all information available to the Court, taking into account the particular situation and circumstances. One of the factors to be considered is the fair market value of the property taken (or cost to the victim of replacing the property). *See* U.S.S.G. § 2B1.1, cmt. 3(C)(i).

In FDCA fraud cases, the Eleventh Circuit has sanctioned using a company's gross sales as an appropriate measure of the actual loss amount – versus using the defendant's monetary gain from the scheme as the loss amount. *Munoz*, 430 F.3d at 1371-72; *see also United States v. Bhutani*, 266 F.3d 661 (7th Cir. 2001); *United States v. Marcus*, 82 F.3d 606 (4th Cir. 1996).

Here, there are several reasons why the defendants should be held accountable for a "loss" amount exceeding $1,000,000. First, the actual loss amount is not a mystery. Abbott Laboratories, the victim in this case, suffered a loss exceeding $1,000,000 (but less than $2,500,000) from the defendants' criminal conduct. The product that the defendants illegally possessed, rebranded, and sold were valued, wholesale, at $56.99 a box, for a total value of $1,715,342.01 (based on 30,096 boxes). The defendants understood that this product had

significant worth to their customers – hence, their continued efforts (including time and resources) to rebrand the boxes and deceive buyers that the products were usable.

Second, the defendants – each of them – are responsible for the entire conspiracy they were engaged in – not just the $89,000 worth of illegal sales they were caught red-handed dealing in (or just the specific sales they were present for). *Munoz*, 430 F.3d at 1373 ("all losses caused by fraud and deceit … may be imputed to a defendant who was a member of the conspiracy which caused those losses.") (internal citation omitted); *United States v. Rini*, 229 Fed. Appx. 841, *846, 2007 WL 1198448, **4 (11th Cir. Apr. 24, 2007) (same). Indeed, as TARRIO stated to law enforcement agents during an interview in February 2013, all three defendants had access to and were ready to sell approximately 30,000 units of FreeStyle Lite Blood Glucose Test Strips. Evident by law enforcement's investigation, the defendants showed no effort to slow down their sales of the illegally obtained product. Rather, they only stopped selling the diabetic test strips on the black market when they were arrested in this case. Therefore, not only is it reasonable to believe that the defendants would have continued selling the stolen diabetic test strips until they had no more, but it is reasonable to believe that they sold this product to many other customers – outside of the sales to undercover law enforcement agents or to victims that reported the fraud – prior to and during the conspiracy time period.

Last, it is important to understand the type of product that the defendants were rebranding and illegally selling. Diabetic test strips measure glucose, or blood sugar levels, for individuals with diabetes. By tampering with diabetic test strips, the defendants risked the health of the product's end users, who could have had false readings due to the defendants' conduct. Some of the diabetic test strips had expired, causing further risk to the users (and liability to Abbott Laboratories). Not only can Abbott Laboratories never reuse the products that the defendants

stole and misbranded, but they can never fully make the end users of their products whole from the fraud that occurred in this case.

    **II.    THE DEFENDANTS ADVERSTISED THE DIABETIC TEST STRIPS FOR SALE OVER THE INTERNET, THEREFORE THE TWO-LEVEL ENHANCEMENT FOR "MASS MARKETING" IS WARRANTED.**

The defendants argue that they did not engage in "mass marketing," and, therefore, that the two-level enhancement under U.S.S.G. Section 2B1.1(b)(2)(A) is unfounded. They are mistaken. For purposes of subsection (b)(2), "mass marketing" means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or service …." Simply put, "mass marketing" merely requires advertising that reaches a large number of persons. *See, e.g., United States v. Morrison*, 713 F.3d 271, 284-85 (5th Cir. 2013); *United States v. Usman*, 460 Fed. Appx. 414, 418, 2012 WL 470216, **3 (5th Cir. Feb. 13, 2012); *United States v. Hall*, 604 F.3d 539, 545 (8th Cir. 2010).

Clearly, the defendants engaged in "mass marketing" during the course of the conspiracy. Indeed, the defendants solicited customers by posting ads for "diabetic test strips" over the Internet. That is precisely how they found prospective buyers. Specifically, as demonstrated in Exhibit A (attached hereto), such ads were posted on Craigslist, a classified advertisements website with sections devoted to jobs, housing, personals, for sale, items wanted, services, community, gigs, résumés, and discussion forums. Craigslist ads can be seen anywhere in the World – in fact, many of the customers who were victims of the defendants' fraud, such as the Hermans, were solicited through such Craigslist ads and did not reside or do business in South Florida.

Moreover, for purposes of the enhancement, the "mass marketing" need not be directed at the actual victims of the fraud. *Usman*, 2012 WL 470216, at **3. In addition, the enhancement may be applied even where the defendant did not actively participate in the mass marketing activities – but, rather, was part of the overall conspiracy to solicit customers on a widespread level for a fraudulent purpose. *Id*.

### III. THE OFFENSE INVOLVED RECEIVING STOLEN PROPERTY AND DEALING IN THE BUSINESS OF SELLING SAID STOLEN PROPERTY; THUS, A TWO-LEVEL ENHANCEMENT UNDER SECTION 2B1.1(b)(4) SHOULD APPLY.

The defendants admit that they received stolen property – that is, they knew that the FreeStyle Lite Blood Glucose Test Strips were stolen when they took possession of them – and knowingly rebranded and tampered with the stolen property in order to resell them. For this reason, the two (2) level enhancement for an "offense [that] involved receiving stolen property and the defendant[s] [were] person[s] in the business of receiving and selling stolen property" is warranted here under U.S.S.G. Section 2B1.1(b)(4). *See United States v. Rivero*, 150 Fed. Appx. 949, 952, 2005 WL 2471018, **2 (11th Cir. Oct. 7, 2005) ("He also received a two level enhancement, pursuant to § 2B1.1(b)(4)(A), because the offense involved more than minimal planning.") The value and size of the inventory of the stolen property maintained and sold by the defendants were high and large, respectively. Further, the defendants took extensive steps to rebrand the stolen property in order to achieve their end goal: the black market sale of over 30,000 fraudulently obtained diabetic test strips.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court adopt the factual findings and sentencing guideline calculations in the PSIs, with the addition of a two-level enhancement under U.S.S.G. Section 2B1.1(b)(4).

> Respectfully submitted,
>
> WIFREDO A. FERRER
> UNITED STATES ATTORNEY
> SOUTHERN DISTRICT OF FLORIDA
>
> __s/ *Vanessa Singh Johannes*_____
> Vanessa Singh Johannes
> Assistant United States Attorney
> Court No. A5501644
> 99 N.E. 4th Street, Suite 808
> Miami, Florida 33132
> Telephone: (305) 961-9023
> E-mail: Vanessa.S.Johannes@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2013, I electronically filed the foregoing document, the United States's Response in Opposition to the Defendants' Objections to Their PSIs, with the Clerk of the Court using CM/ECF. Counsel for the defendants, Vincent Farina, Jeffrey Feiler, and Elio Vasquez, received a true and correct copy of said document (and the exhibit thereto) via that manner.

> __s/ *Vanessa Singh Johannes*_____
> Vanessa Singh Johannes
> Assistant United States Attorney